**2012-1380**
**(Reexamination No. 95/001,069)**

# United States Court of Appeals
# For The Federal Circuit

FUNCTION MEDIA L.L.C.,

*Appellant,*

v.

David J. Kappos, DIRECTOR, UNITED STATES PATENT AND
TRADEMARK OFFICE,

*Appellee,*

and

GOOGLE, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
BOARD OF PATENT APPEALS AND INTERFERENCES.

## BRIEF OF APPELLEE GOOGLE, INC.

*John C. Phillips*
*Jason W. Wolff*
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA  92130
(858) 678-5070

*John A. Dragseth*
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
(612) 335-5070

**September 24, 2012**

*Attorneys for Appellee*

2012 – BACHMAN LEGAL PRINTING – FAX (612) 337-8053 – PHONE (612) 339-9518 or 1-800-715-3582

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Appellee Google, Inc. certifies the following:

1. The full name of the party represented by me is:

   Google, Inc.

2. The name of the real party in interest represented by me is:

   Google, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the United States Patent and Trademark Office or are expected to appear in this court are:

   Fish & Richardson P.C.: John Phillips, John Dragseth and Jason Wolff

Date: September 24, 2012                    By:  /s/ John Dragseth_____

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF RELATED CASES ................................................. 1

STATEMENT OF JURISDICTION ................................................... 1

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE ........................................................... 2

INTRODUCTION .............................................................................. 4

STATEMENT OF THE FACTS ........................................................ 6

    A.    The Prior Art AdForce System:  Allowing Advertisers to Create Ads and Select Web Venues for Publishing The Ads. 6

    B.    The '059 Patent:  Allowing Advertisers to Create Ads and Select Web Venues for Publishing The Ads ........................ 12

    C.    Proceedings at the Patent Office ........................................... 18

SUMMARY OF THE ARGUMENT ................................................ 22

ARGUMENT .................................................................................... 23

    **A.**    **Standard of Review** ............................................................. 23

    **B.**    **The Patent Claims Do Not Require The Computer Controller to Create the Advertisements** ........................ 25

        1.    The Claim Language Does Not Require That the Computer Controller Create the Advertisements, and Does Not Exclude User-Based Creation ................................... 25

        2.    Function Media Admits That The Specification is Consistent With User/Third Party Professional Creation of Advertisements .............................................................. 31

# <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

**C.    The Board's Invalidity Findings Are Supported by Substantial Evidence**............................................................ 33

CONCLUSION.................................................................... 35

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                               **<u>Page(s)</u>**

*Bowers v. Baystate Technologies, Inc.*,
   302 F.3d 1334 (Fed. Cir. 2002) ..................................................... 33

*Combined Systems, Inc. v. Defense Technology Corp. of Am.*,
   350 F.3d 1207 (Fed. Cir. 2003) ..................................................... 27

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   93 F.3d 1572 (Fed. Cir. 1996) ....................................................... 30

*E-Pass Technologies, Inc. v. 3Com Corp.*,
   473 F.3d 1213 (Fed. Cir. 2007) ..................................................... 27

*In re Am. Academy of Science Tech Center*,
   367 F.3d 1359 (Fed. Cir. 2004) ..................................................... 24

*In re Applied Materials, Inc.*,
   -- F.3d --, 2012 WL 3711586 (Fed. Cir. Aug. 29, 2012)............... 35

*In re Bigio*,
   381 F.3d 1320 (Fed. Cir. 2004) ..................................................... 25

*In re Buszard*,
   504 F.3d 1364 (Fed. Cir. 2007) ..................................................... 24

*In re Jolley*,
   308 F .3d 1317 (Fed. Cir. 2002) .................................................... 24

*In re Kumar*,
   418 F.3d 1361 (Fed. Cir. 2005) ..................................................... 24

*In re SuitCo Surface, Inc.*,
   603 F.3d 1255 (Fed. Cir. 2010) ..................................................... 24

*In re Watts*,
   354 F.3d 1362 (Fed. Cir. 2004) ..................................................... 23

*In re Zletz*,
   893 F.2d 319 (Fed. Cir. 1989) ....................................................... 24

*Intervet Am., Inc., v. Kee-Vet Lab., Inc.*,
   887 F.2d 1050 (Fed. Cir. 1989) ..................................................... 27

iv

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                  **<u>Page(s)</u>**

*Loral Fairchild Corp. v. Sony Corp.*,
   181 F.3d 1313 (Fed. Cir. 1999) ..................................................... 27

*Mantech Environt'l Corp. v. Hudson Environmental Servs., Inc.*,
   152 F.3d 1368 (Fed. Cir. 1998) ..................................................... 26

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) ....................................................... 33

v

## STATEMENT OF RELATED CASES

Function Media's statement of related cases is generally accurate to Google's understanding, with the following exception and updates:

- Function Media identifies its motion for reconsideration at the Board in the '045 patent's reexamination, but does not mention Google's simultaneously-filed motion for reconsideration on the ground that the Board erred by refusing to reject Function Media's claims even after it found that the claims lacked corresponding structure for their means-plus-function limitations, and were thus objectionably broad (and thus plainly covered by the prior art);

- As of the filing of this brief, both reconsideration motions are still pending before the Board;

- Since Function Media filed its Blue Brief, this Court has dismissed, for failure to prosecute, Function Media's appeal from the reexamination of the '587 patent (Fed. Cir. Docket 2012-1379).

For the Court's benefit, Google notes that the '059 and '025 claim language is very similar, and taking into account limitations added in the '059 patent, each party makes essentially the same arguments in the two co-pending appeals.

## STATEMENT OF JURISDICTION

Function Media's statement of jurisdiction is accurate.

## STATEMENT OF THE ISSUES

Function Media's statement of the issues is inaccurate, as it fails to identify the proper standard of review. The issues, when stated accurately, are:

1.    Did the Board correctly conclude that a limitation that recites "processing … the electronic advertisement" did not equate to creating the

1

advertisement, where (a) a separate limitation recites "input[ting] information to create" the advertisement, (b) the processing limitation does not mention creating in any manner, and (c) the specification explicitly discloses advertisement creation wholly separate from the recited advertisement processing?

2.     Does substantial evidence support the Board's factual finding that the AdForce User Guide anticipates claim 1 of the '059 patent, and by extension, the other claims on appeal?[1]

## STATEMENT OF THE CASE

This is an appeal from an *inter partes* reexamination relating to Function Media's '059 on-line advertising patent.[2]   The appeal is about whether the claims cover a user's creation of an electronic advertisement that is then processed by a central advertising server (as found by the Board), or whether the claims cover *only* creation of the advertisement by a computer server, and not user-based advertisement creation.

Google sought reexamination of the '059 patent on July 21, 2008, along with three other Function Media patents in the family of the '059 patent.  [A146-226] The Examiner repeatedly rejected all of the requested claims over a User Guide for

---

[1] Although Function Media mentions other claims in the fact section of its brief, its argument focuses on claim 1, and it makes no arguments other than those directed to claim 1.  Also, Function Media does not dispute that the secondary reference, Wojcik, adequately discloses the features for which the Board relied on it.

[2] The full patent number is U.S. Patent 7,249,059, and reexamination was sought on claims 1-52—all of the claims in the patent.

2

an on-line advertising system known as AdForce, and separately over other references, both alone and in combination. [A2321-32; A4010] In affirming the Examiner's rejections, the Board limited its ruling to the AdForce reference as its primary reference, and Function Media ties all its appeal arguments to claim 1 of the '059 patent, so the issues for this Court are relatively narrow.

To the Examiner and to the Board, Function Media argued that the AdForce reference did not disclose a "computer controller … processing and publishing the electronic advertisement" recited in the claims because, in Function Media's view, "processing" an advertisement was the same as "creating" an advertisement—and (according to Function Media) AdForce employed user creation before the further processing. Function Media stuck to this argument despite the facts that the claims include distinct limitations for "processing" an advertisement and for entry of information "to create" an advertisement, and that the '059 patent discloses "creating" performed on a user's device in response to user input (as compared to processing on a central computer). Google highlighted each of these points, and the Board agreed with Google and the Examiner in an opinion issued January 27, 2012. [A1-A33] The Board reasoned that, on the "plain language of the claims," the computer controller "processes" the "electronic advertisement," which was distinct from the "information" entered to create the advertisement. [A17-18] The Board also pointed out that the specification was consistent with such a

construction because it disclosed an embodiment in which a user in the form of a "seller"—and not a central controller—created an advertisement. [*Id.*] Function Media appealed from the decision on March 24, 2012. [A4565-67]

Function Media's arguments with respect to this patent family were also rejected in the other reexaminations and in a parallel district court litigation over the four patents. One of the reexaminations (over U.S. Patent 6,446,045) is still pending before the Board, a second (over U.S. Patent 7,240,025) is co-pending at this Court in Docket No. 2012-1381, and the appeal of the last reexamination was dismissed by this Court for lack of prosecution (U.S. Patent 6,829,587). [Fed. Cir. Docket No. 2012-1379, Doc. #20]

As for the parallel litigation, Function Media dropped the '587 patent before trial, the court found the claims of the '045 patent invalid for indefiniteness because of a lack of corresponding structure for means-plus-function limitations, and a jury found all asserted claims of the '025 and '059 patents invalid and not infringed. The district court denied Function Media's JMOL motions, except with respect to validity of claims 52, 63, 90, and 231 of the '025 patent (which Function Media does not argue separately in the co-pending appeal). The appeal from the litigation is pending, and was argued on July 12, 2012, to a panel of Chief Judge Rader, and Circuit Judges Newman and Reyna.

**INTRODUCTION**

This appeal is about on-line advertising, and whether a claim limitation directed to "processing … the electronic advertisement" at a computer controller ***necessarily*** means "creating … the electronic advertisement" at the computer controller—a finding that is a predicate for any ruling in Function Media's favor. The Board properly held that ***processing the advertisement does not have to be creating the advertisement*** because the "plain language of the claims" indicated that the advertisement was previously created before the processing. Such a finding is bolstered by the fact that a separate limitation refers to a user being "prompted ***to input information to create an electronic advertisement***"—where no form of the term "create" appears in the "processing" limitation. And the Board's finding is further supported by the description of user creation in the specification—which supports user creation, as opposed to creation as part of processing at a computer controller.

Function Media's response is notable for its circularity. Specifically, when pushed on the lack of claim-based support for its position, Function Media notes that the "'processing' limitation in claim 1 necessarily refers to the act of creation ***when read in light of the specification***." [Blue Br. at 21]  But when one points out that the specification actually discloses user creation of advertisements separate from the "processing" step, Function Media says that fact is a "non-issue, since claim 1 limits creation of advertisements to the computer controller." [Blue Br. at

5

41] When pushed on the claims, Function Media retreats to the specification—when pushed on the specification, Function Media retreats to the claims. That is a pure verbal shell game, and provides no basis to vacate the carefully-reasoned opinion of the Board on the required deferential standard of review.

## STATEMENT OF THE FACTS

### A.     The Prior Art AdForce System:  Allowing Advertisers to Create Ads and Select Web Venues for Publishing The Ads

The '059 patent relates to a mechanism for a user, in the form of a "third party professional" or "seller" (*e.g.*, an advertiser), to create presentations (e.g., electronic advertisements) and publish them to internet media venues (e.g., Web sites of publishers) owned or controlled by others.  [A40, A97-100]  The patent distinguishes its approach from prior art approaches that required an advertiser to "submit[] materials to each and every media outlet or to stand-alone electronic malls, outlets, or directories"—a "time consuming and costly business necessity [that] has created huge marketing programs and agencies for large businesses." [A97(1:36-47)]  The patent notes that its "invention allows sellers to present their inventory, products, goods and services in a choice of one of a variety of supported media outlets," and to provide information to create advertisements for such media outlets.  [A98(3:65 to 4:19)]  Putting it all together:  "This invention improves on the prior art by creating a controlled, managed environment for the sellers in which to create their presentations."  [A99(6:59-62)]

6

The same thing, however, had been fully implemented more than a year earlier in a product called AdForce. The AdForce User Guide (version 2.6) [A1080-1364] is the one prior art reference in this appeal (and the AdForce product was central to the parallel litigation). The User Guide notes in its introduction:

> AdForce™ is a full-service advertising solution designed to ***create, manage, target, and report advertising*** on the World Wide Web. Centralized outsourced ad serving eliminates the need to purchase and manage hardware and software.

[A1089 (emphasis added)] Thus, AdForce was directed to the same problem as the '059 patent—helping a user create and target advertisements to multiple media venues (web sites) from a single access point.

Chapters 6 and 7 of the User Guide discuss how AdForce employed various graphical interfaces to allow users to create, manage, target, and report advertising. The graphical interfaces were managed from "client software" on the users' computers, and the processing and placement of advertisements was controlled by the AdForce server. [A1092-93; A1095-1111; A1157-63] AdForce provided separate interfaces to operators of media venues (*e.g.*, web page publishers) and to third party professionals or sellers (*e.g.*, advertisers and agencies) who sought to place their advertisements on such venues.[3] For venue owners, one interface

---

[3] Function Media recognizes that the patent indicates that all the functionality available to "sellers" was also available "third party professionals," and Function Media does not make a distinction between the terms with respect to applying the AdForce prior art (which had users and "SuperUsers" who acted on behalf of the

(which matches the "***first interface***" limitation of claim 1 below) prompted the input of presentation rules (*e.g.*, ad sizes in pixels) for displaying electronic advertisements on their respective venue:



Figure from AdForce [A1279-1280]

Function Media does not dispute that the AdForce reference fully discloses the "first interface" limitation of the '059 patent claims.

The AdForce system also had interfaces (which match the "***second interface***" limitation of claim 1 below) that prompted information that identified a seller:

---

users). [*See, e.g.,* Blue Br. at 9] We also use the terms generally interchangeably here, and refer to sellers and third party professionals collectively as "users."



Figures from AdForce [A1098; A1157]

Again, Function Media does not dispute that the AdForce reference fully discloses the "second interface" limitation of the '059 claims.

The AdForce system stored this information in databases—the "*first database*," "*second database*," and "*third* database" respectively, of the '059 patent's claim 1—each of which Function Media does not dispute are disclosed by the AdForce User Guide.

For the sellers or third party professionals to enter such information, AdForce provided a pair of screens (the "*third interface*" of claim 1 below, from the "creating" limitation) that prompted a user to input information to (a) select one or more media venues ("content targets" in the User Guide's terminology) to carry the seller's advertisements (see below left); and (b) create an electronic advertisement for publication to the selected venues (below right):

9




Figure from AdForce [A1226]      Figure from AdForce [A1231]

The seller in the AdForce system could create two versions of an advertisement (referred to in AdForce as a "creative"[4]):

(1) a first version created by selecting an image file to be displayed along with a textual description, and defining certain other parameters for that ad; and

(2) a second version created by specifying so-called "Alt Text," which appears on a browser when a web user who is viewing the media venue (web page) moves the mouse over a displayed image.

[A1185-89; A1231]    Although the graphical, first version of the advertisement might not display properly for all venues, the second, Alt Text version of the advertisement was mere text and would be displayed instead.  [A1185-89] Thus, the creation of the content of the Alt Text advertisement was necessarily complete when the seller entered the text as that was all there was to the advertisement.

---

[4] [*E.g.*, A1229-32]

10

The AdForce server system (a central "***computer controller***," using the language of claim 1) then processed the advertisements for sending them to selected publisher/media venue rules. It did so by the server software (known as the "AdForce Service") interacting with the client browser software to dynamically process and publish advertisements aided by tags, which were placed in the HTML code for media venues (web pages). [A1289-95] The screen below shows how AdForce would create code for such tags for the media venue owners to cut-and-paste into their web page code:



[A1293] When the web page was then displayed to a user, the tag caused the AdForce server to be called, which in response delivered, for example, an image (a so-called "banner" ad) and Alt Text advertisements for display with the web page, along with a URL hyperlink that the seller previously entered in the "second

11

interface" above. [A1289-95] Via these steps then—and central to this appeal—an AdForce user entered information to create advertisements (both a rich graphical advertisement and an Alt Text advertisement), and the AdForce service processed and published the advertisements when a request was received via a tag at an appropriate media venue.

Finally, relevant to Function Media's argument that the computer controller in its claims "makes the final decision on where to publish" [*see, e.g.*, Blue Br. at 40], the AdForce system also permitted a user to create multiple advertisements, as part of a "campaign," and the AdForce server (the "computer controller") would decide which of the advertisements was the best to publish to a particular media venue. [A1175 ("Determining Which Ad to Serve.")]

**B.      The '059 Patent:  Allowing Advertisers to Create Ads and Select Web Venues for Publishing The Ads**

Claim 1 of the '059 patent—the only claim argued by Function Media on appeal—recites nothing more than what is discussed above in the AdForce reference. As an initial matter and as noted above, Function Media does not dispute that the AdForce reference discloses the claim limitations calling for an advertising computer system, a first interface for operators of the media venue, a second interface for information identifying the seller, and databases for storing such data:

12

1.  A computer system allowing a third party professional to manage, create and publish customized electronic advertisements, for a seller, to internet media venues owned or controlled by other than the seller and other than the third party professional, comprising:

        a first interface to the computer system through which each of the internet media venues is prompted to input presentation rules for the internet media venue for displaying electronic advertisements on the internet media venue;

        a first database storing the presentation rules input by the internet media venues through the first interface;

        a second interface to the computer system through which a seller is prompted to input information identifying the seller; and

        a second database storing the identifying information input by the seller through the second interface;

        . . .

        a third database storing the information input by the third party professional through the third interface; and

        . . .

[A140-41]

The remaining two limitations, which *are* in dispute, recite what occurs, respectively, at the user's client computer and at the central computer. The first—the "creation" limitation—recites an interface that prompts the third party professional to select a media venue and to input information to create an advertisement:

> a third interface to the computer system through which the third party professional is prompted to input information to select one or more of the internet media venues and prompted ***to input information to create an electronic advertisement*** for the seller for publication to the selected internet media venues;

[A140(88:56-61)] Such an interface—if the plain language is followed—is shown by the following side-by-side AdForce screen shots, which show forms for a seller

13

to select media venues and to input information to create an advertisement (e.g., an image, URL, and Alt Text for the advertisement):




      Figure from AdForce [A1226]        Figure from AdForce [A1231]

The final limitation of claim 1—the "processing" limitation—is a computer controller that processes and publishes "the electronic advertisement":

> a computer controller of the computer system ***processing and publishing the electronic advertisement*** to one or more of the selected internet media venues whereby the electronic advertisement is displayed on the one or more of the selected internet media venues in compliance with the presentation rules of the internet media venue.

[A140-41(88:64 to 89:3)]  Notably, the claim language does not say that the user-entered "information" is processed (so as to create an advertisement in the first instance)—but instead says that "the advertisement" is processed, thus requiring "the advertisement" to have already been created.  And notably, this language

14

simply says the advertisement is displayed in compliance with the presentation rules, but does not say that the processing is what makes the advertisement compliant.  It is this plain language that Function Media continuously tries to manipulate in this appeal.

As for the '059 patent specification, it is unsurprising that user creation is described there, given that the claim 1 language includes user creation.  Function Media does not point to a disclaimer—let alone a clear and unmistakable disclaimer—in the specification that somehow excludes user creation from the claims or somehow supports its theory that the separate user "creation" and system "processing" steps are one and the same.   To the contrary, the specification plainly discloses user creation (and Function Media admits as much for the first time in this appeal   [Blue Br. at 22-23 and 38-39]).

For example, the patent shows figures of the "central controller and presentation processor" (Fig. 2a) and the "seller interface" (Fig. 2c).[5]   While Function Media focuses solely on the "presentation generation program" 1710 in the former figure, there is also a Presentation and Configuration Program 4714 in

---

[5] Fig. 2f shows a "Third Party Professional Interface" that has the same relevant components as the Seller Interface.  For consistency with the co-pending appeal on the '025 patent, and because Function Media has not made a distinction between the Seller and the Third Party Professional, we reference Fig. 2c here.

the seller interface by which the presentations "are created,"[6] using media-specific

presentation rules imposed by data in the Presentation Rules Database 4650:



**Fig. 2a:  Central Controller and** **Fig. 2b: Seller Interface [A46]**
**Presentation Processor [A45]**

This operation is clearly explained by the specification, which indicates that the

Presentation and Configuration Program 4715 in the seller interface (not the

Presentation Generation Program 1710 in the Central Controller) uses the data in

the Presentation Rules Database 4650 to create the advertising presentations for

---

[6] The presentations created by the seller are stored in the Presentations Database
4640 on the seller's computer (4000) (Fig. 2c).  These created presentations are
then synchronized with the Presentations Database 1640 on the central controller
(1000) (Fig. 2a).  [A107(22:51-67)]

each particular venue:

> The Seller could then choose one or two or all of the media/means of communication in which to be represented, ***with all presentations created by*** **the Presentation and Configuration Program 4715** (blocks 11130, 11132).  The Presentation and Configuration Program 4715 would then prompt the Seller for the necessary and optional information to complete the presentations (block 11140, 11142). ***During this process where the presentations are being created***, the Seller may choose to utilize one of the Third Party Professionals as a supplier of content, products, or services. For example the Seller may choose to obtain a stock photo or graphic of a sailboat from one of the Third Party Professionals to include in the printed magazine presentations or the Seller may choose a tracking service to monitor the effectiveness of the Internet Directories. It should be noted that each presentation might have very different standards for publishing the same information. In those cases, the same questions or at least similar prompts may be presented to the Seller, requiring the entering of virtually the same information in multiple locations on the forms. ***Although this may seem redundant to the Seller, the differences will become apparent because each separate entry is controlled by the information contained within the Presentation Rules Database 4650. As a simple example, the description in a particular Internet Directory may allow for up to 3000 characters, whereas a printed magazine may allow only 300, depending on the presentations chosen. As the Seller enters information, the Presentation and Configuration Program 4715, using the information contained in the Presentation Rules Database 4650, controls and monitors that entered information to conform to the controlling format and style for each targeted media venue or outlet presentation.***

[A123(53:25-56) (emphasis added)]    Function Media spends page-after-page emphasizing disclosure that it says is consistent with automatic ad creation, but that is beside the point, rather, because ***Function Media must establish that the patent actually excludes user creation to even attempt to distinguish the prior art***. Function Media makes no efforts to that end with respect to the specification, and

its arguments to circumvent the plain teachings of the prior art ultimately depend on its unsuccessful attempt to change the plain claim language via confused citations to the specification. Despite all that Function Media hopes to achieve via its Blue Brief, the '059 patent claims plainly recite seller/user creation of advertising presentations as disclosed in the prior art.

## C.    Proceedings at the Patent Office

The reexamination proceedings were characterized by Function Media's repeated efforts to unabashedly redraft or add limitations to claim 1 that would require advertisement creation to occur only at the central computer controller, and nowhere else, such as at the Seller Interface—and by the Examiner's repeated, detailed, and well-reasoned rejection of Function Media's arguments. Through it all, Function Media refused to amend its claims or to add any new claims that positively recited the features that Function Media seeks to import into the claims, so that the invention, as Function Media posits it, could actually be tested against the prior art.

The first Office Action explained the Examiner's initial rationale over more than 260 detailed pages of analysis. [A2338-41; A2443-45; A2598] Function Media did not start its response with the claim language, but with a single one of many supposed advantages of the invention. The one advantage picked by Function Media mentions "automatic restructuring of the data entered by the

18

seller"—which Function Media used to argue for an unsupported, unclaimed invention that requires automatic advertisement creation at the central controller, via a limitation that did not mention "creating an advertisement" but rather "processing the advertisement."  [A2627-29]  Function Media argued that the invention transforms and restructures user-entered information into advertisements from mere "raw" information entered by the Seller—*i.e.*, the invention, at least according to Function Media, allows users to create presentations "whose look and feel can be changed to match the look and feel of media venues to which the advertising content is to be published."  [A2631]

Google debunked each point.  First, Google pointed out that Function Media was committing the "cardinal sin" of reading limitations into the claim via a proposed rewriting of the claims.  [A2835-36]  Such rewriting was, of course, inconsistent with the specification's description of user-created advertisements. [A123(53:25-56)]  Moreover, Google noted that the preamble of claim 1 explicitly recites allowing the third party professional to create advertisements.  [A2837] Thus, as Google noted, the information entered "to create" the advertisement was not tied by the claims to any "automatic creation" of advertisements to the separate computer controller.

The Examiner ultimately again rejected all of the claims that were under reexamination in a 185-page Action Closing Prosecution, which mapped each of

19

the limitations of claim 1 to the AdForce User Guide.  [A4010; A4015-17; A4194]

Although Function Media's response did not amend the claims, its remarks reworded the claim from beginning-to-end in a manner that edited out the critical claim language and inserted numerous new limitations.  For example, while the claims recited that a user was "prompted *to input information to create* an electronic advertisement," Function Media re-worded that claim language into terms that it wished were in the claims arguing that the claim:  "prompts a third party professional to … input information that *will be used* to create an electronic advertisement. . ."  [A4201-02 (emphasis added)]  Function Media thus tried to change the present-tense language that actually appears in the claims into future-tense language, which does not appear in the claims.

Function Media also asserted that the specification made it clear that Function Media's interpretation was the only proper reading of the claim—but Function Media never addressed the fact that, as discussed above, column 53 of the specification actually discussed user creation of advertisements.  [A4205-06]

The Examiner rejected all of Function Media's points, as did the Board after another round of filings by the parties.  For example, the Board quoted directly from the relevant claim clauses, and explicitly accepted the Examiner's position that "the language of claims 1 and 27 includes no limitation which would require the automatic creation of advertisements or for this creation to be performed

20

exclusively at the computer controller." [A16] Expanding on that reasoning, the

Board noted:

> Based upon the plain language of the claims, we find claims 1 and 27
> recite that an "electronic advertisement" is created from third party
> professional "input information" and there is no "electronic
> advertisement" created until the third party professional is prompted
> to do so by the third interface of the computer system. Claim 1
> further recites that the computer controller "processes" the "electronic
> advertisement," which we find to be distinct form the "information"
> inputted by the third party professional at the third interface recited by
> claims 1 and 27 to create an "electronic advertisement." Thus,
> contrary to [Function Media's] assertion, the language of independent
> claims 1 and 27 fails to make a recitation which would require the
> computer controller to automatically create the electronic
> advertisements by "processing" the inputted "information."

[A17] As for the specification, the Board noted that its interpretation was:

> commensurate with the scope of the '059 patent's specification which
> describes that the Presentation and Configuration Program 4715 acts
> as the controlling software interface for the seller or third party
> professional to choose which media or advertising channels the seller
> wishes to participate in (i.e., select one or more internet venues) and
> then presents the seller with a series of questions with the answers
> (i.e., input information) used to create a presentation.

[A18] To that end, the Board then cited the particular embodiment, discussed

above in relation to column 53 of the '059 patent, in which the Presentation Rules

Database 4650 on the Seller Interface was used to help control and monitor user-

entered information so that it would conform to "each targeted media venue or

outlet presentation" (thus disposing of Function Media's argument—repeated to

this Court—that compliance or conformance with media venue requirement is

wholly the realm of the central controller and has nothing to do with user-creation of advertisements).  [Id.]

> The Board ended its claim construction analysis by quoting *In re Bigio*:
>
> "Absent claim language carrying a narrow meaning, the PTO should only limit the claim based on the specification and prosecution history when those sources expressly disclaim the broader definition."

[A21 (*quoting* 381 F.3d 1320, 1325 (Fed. Cir. 2004)]

Applying the claims to the AdForce prior art, the Board noted that Function Media's "contention 'fail[s] from the outset because … it is not based on limitations appearing in the claims . . .,' and is not commensurate with the broader scope of the independent claims which recite that an electronic advertisement is created at a third interface, where a third party professional is prompted to input information, and not as Patent Owner contents automatically, by a central controller."  [A21 (*quoting In re Self*, 671 F.2d 1334, 1348 (CCPA 1982)]  With each of its arguments thoroughly addressed and rejected by the Examiner and the Board, Function Media filed this appeal.

## SUMMARY OF THE ARGUMENT

The plain language of claim 1 is open to user creation of advertisements, and is not strictly limited to automatic creation by the computer controller, because "the advertisement" cannot be processed unless it exists (*i.e.*, has previously been created), and because the claim recites that user previously entered "information to

22

create an advertisement" in the present tense.  Function Media cannot rewrite action "to create" an advertisement to recite an advertisement "to be created." Function Media's arguments depend wholly on (1) a meandering attempt to tie the "second interface" limitation to the "computer controller" even though there is no language in those limitations to make that connection; (2) a complete failure to recognize that logic and this Court's long line of case law demand that an advertisement must have been created before it can be processed; and (3) repeated and misplaced assertions that the claim ***does not require*** user-based creation, when in fact, Function Media must establish at least that the claim ***cannot cover*** user-based creation.

As for the specification, Function Media admits the presence of the user creation embodiment discussed above but calls it a "non-issue" because of Function Media's view of the claim language.  In short, Function Media has no argument based on the specification.

With the claims properly understood, the AdForce User Guide invalidates Function Media's claims, a point that Function Media does not fairly dispute.

## ARGUMENT

### A.    Standard of Review

Function Media has the burden to show that the Board committed reversible error.  *See In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).  With that in mind,

this Court reviews the Board's determination of anticipation for substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Kumar*, 418 F.3d 1361, 1366-67 (Fed. Cir. 2005) (quotation omitted). "[W]here two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F .3d 1317, 1329 (Fed. Cir. 2002).

Claim construction is reviewed *de novo*, but requires that the claims receive a "broadest reasonable construction." *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989)**.** Such construction can be broader than a construction given in a district court litigation because patentees are able to amend claims in reexamination and the broad interpretation encourages amendments that make claim language clearer and improve the public notice function of the claims. *See In re Am. Academy of Science Tech Center*, 367 F.3d 1359, 1369 (Fed. Cir. 2004); *In re Buszard*, 504 F.3d 1364,1366-67 (Fed. Cir. 2007).

Function Media cites extensively in its "Standard of Review" section for a modification of the broadest reasonable construction from *In re SuitCo Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010), but never points out how that decision applies to the facts of this case. [Blue Br. at 30-31] Function Media's failure in

24

this regard was explained by the Examiner, who pointed out: "in that case [*SuitCo*] the limitation at issue was found in the express language of the claim along with the specification." [A7058] Neither predicate is true here (nor has Function Media even alleged that they are), and the proper application of the "broadest reasonable construction" rule in this case comes from the Board's quotation of *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004):

> Absent claim language carrying a narrow meaning, the PTO should only limit the claim based on the specification and prosecution history when those sources expressly disclaim the broader definition.

[A21] Even Function Media does not assert that there is a disclaimer.

## B.    The Patent Claims Do Not Require The Computer Controller to Create the Advertisements

### 1.    The Claim Language Does Not Require That the Computer Controller Create the Advertisements, and Does Not Exclude User-Based Creation

The plain language of claim 1 has no automatic advertisement creation requirement, and Function Media commands an Odysseus-level journey through two separate claim limitations to stitch one together. The claims, however, recite that "the advertisement" is processed, so that processing cannot be synonymous with advertisement creation as Function Media insists. The claims also recite that the user provides "information to create an advertisement" in the present tense, and not at a future time when the advertisement is ***to be created*** by the computer controller. And the claims certainly do not equate "processing" with the very

25

different "creating." Function Media has nothing more than hand waving for each of these points—which were well-understood and well-handled by both the Examiner and the Board.

       i.    **The Plain Claim Language Indicates That Creating an Advertisement and Processing "the Advertisement" Are Different Things, and Creating the Advertisement Must Precede Processing "the Advertisement"**

The "processing" limitation of claim 1 recites that "the advertisement" is processed, so the advertisement must, by mere common sense, pre-exist that processing, as the Board reasoned. [A140] If the advertisement pre-exists the processing, then processing cannot be the same as "creating" the advertisement— the position on which Function Media's entire appeal is based.

Function Media's single response is that it should be excused from this common sense result because the claim drafter needed to refer to "the advertisement" for antecedent basis purposes. [*See* Blue Br. at 33] But this argument wholly ignores a long line of cases from the Court holding that a claim step reciting operations on "the" object, must occur after that object is created. For example, in *Mantech Environmental Corp. v. Hudson Environmental Servs., Inc.*, 152 F.3d 1368, 1375-76 (Fed. Cir. 1998), the Court affirmed a summary judgment of noninfringement, because the patent recited provided groundwater wells and providing acid from the wells, such that the providing of acid had to follow the providing of the wells. Providing wells is directly analogous to creating

26

advertisements, and the necessarily subsequent action of providing acid from the wells that have already been provided is directly analogous to processing advertisements that have already been created.

The Court has applied the same principle in other cases. For example, in *Combined Systems, Inc. v. Defense Technology Corp. of America*, 350 F.3d 1207, 1212 (Fed. Cir. 2003), the Court affirmed a summary judgment of noninfringement for a patent on method of making non-lethal beanbags fired by shotguns, including the steps of "forming folds" in the rear part of the bag and "inserting said formed folds" into the front of a shotgun shell. The Court reasoned that the folds had to be formed before the bag was inserted because of the recitation of "inserting said formed folds" in the claim. *Id.* And in *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1321 (Fed. Cir. 1999), an insulation layer necessarily had to be in existence before the performance of a step reciting that certain regions were aligned with the edges of "the insulation layer." Just as an insulation layer could not be aligned unless it already existed in *Loral*, in the present case, an advertisement cannot be processed unless and until it already exists.[7]

---

[7] *See also E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("Substantively, because the language of most of the steps of its method claim refer to the completed results of the prior step, E-Pass must show that all of those steps were performed in order."); *Intervet Am., Inc., v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) ("When it comes to a question of which should control, an erroneous remark by an attorney in the course of prosecution of an application or the claims of the patent as finally worded and issued by the Patent

The foregoing cases rely on the fact that an item needs to pre-exist an operation that is performed on the item—and they are dispositive of Function Media's entire appeal. Function Media handles this as an antecedent basis issue, but that is beside the point, which is that an item cannot be acted upon unless it previously exists.

Even on the antecedent basis issue, Function Media loses. If we are to assume that the drafter of the '059 patent was honoring the tenets of antecedent basis and was performing advertisement creation via the "processing" operation— as Function Media asserts—then the drafter would have referred, in the "computer controller" limitation, to the creating that was introduced in the "third interface" limitation. For example, a competent claim drafter faced with Function Media's purported antecedent basis issue could have crafted the computer controller limitation as "a computer controller of the computer system to perform the creating of the advertisement…." That the claims include no such connection between the creating in the "third interface" limitation and any language in the "computer controller" limitation further undercuts Function Media's arguments.

> ### ii.     The Plain Claim Language Indicates that a Third Party Professional is to "Input Information To Create" An Advertisement via a "Second Interface"

Not only does the "computer controller" limitation indicate that the

---

and Trademark Office as an official grant, we think the law allows for no choice. The claims themselves control.").

advertisement was created before the operations in that limitation, but the "third interface" limitation, which precedes the "computer controller" limitation, indicates that the advertisement is created as part of that limitation. Specifically, the relevant language of the "third interface" limitation is recited in the present tense—"to input information <u>to create</u>"—so it is certainly reasonable to read that language as saying that the information that is input has the result of creating an advertisement. Indeed, even Function Media has recognized the absurdity of rewriting the claim so that the information input is made merely with the goal of an advertisement "to be created" sometime in the future—as it has moved strongly away from its approach of rewriting the language to the future-tense "to be created" (though its unsupported underlying point is made now only by implication). In short, the present-tense "to create" language (which is the only claim language that says anything about advertisement creation) most naturally refers to actual creation by the user—and certainly *does not exclude* user-based creation.

Equally telling, the "computer controller" limitation in which Function Media says the "creation" limitation resides fails to say *anything at all* about advertisement creation. Rather, the term "processing," by its plain language, can cover all sorts of post-creation advertisement processing and certainly was intended to do so because the patent specification, by Function Media's own

admission, includes teachings to that end.[8]  Function Media reasons that processing

must be creating because it is recited as producing an advertisement "in

compliance with the presentation rules of the internet media venue [*E.g.*, Blue Br.

at 31], but that wholly ignores that the limitation simply says that the

advertisement must comply, but does not say how that compliance is achieved—

whether by the user interaction or by the computer controller.

Finally, Function Media provides no reason to overcome the strong

presumption that different terms in the same claim should take different

meanings—and indeed refuses even to recognize that well-known rule.  *See, e.g.,*

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir.

1996) (stating that if two terms described a single element, "one would expect the

claim to consistently refer to this element [with one or the other of the two terms],

but not both, especially within the same clause").  Processing an advertisement and

creating an advertisement are—on their faces—two very different things—and

their distinct appearance in the claims highlights that different functionality was

intended.

> ### iii.    Function Media Confuses What the Claims Allow and What they Require

---

[8] The term "processing" is certainly not limited to only "creating."  The '059 patent
teaches other processing steps too, such whether to review the created
advertisement by an editor (Fig. 4d, steps 11250 and 11262) and processing
payment information for publishing the advertisement (Fig. 4d, step 11280).

The Court must affirm as long as the claims are open to user-created advertisements. Function Media, however, carefully suggests a different standard over-and-over, by noting for example that the "claim language plainly does not require" user creation. [*E.g.*, Blue Br. at 22] Such assertions suggest that vacature or reversal is required unless the claims are sufficiently narrow to cover ***only*** user-based advertisement creation. But in fact, to obtain vacature, Function Media must establish that user-based advertisement creation is ***excluded*** by the claims (and even then, only remand would be necessary to consider the art under such an interpretation). Function Media's efforts to avoid that standard are telling, and its repeated failure to address the proper standard is another reason to reject those arguments.

### 2. Function Media Admits That The Specification is Consistent With User/Third Party Professional Creation of Advertisements

The '059 patent specification describes that a seller (or a third party professional) at a seller's location manually creates each advertisement by redundantly entering content for each media venue at a second interface. [A123] Specifically, as discussed above, the specification notes, in describing interaction between the Seller and the Seller Interface:

> The Seller could then choose one or two or all of the media/means of communication in which to be represented, ***with all presentations created by the Presentation and Configuration Program 4715*** (blocks 11130, 11132). The Presentation and Configuration Program 4715 would then prompt the Seller for the necessary and optional

31

information **to complete the presentations** (block 11140, 11142).

[A123(53:25-30)]   This preferred embodiment thus discloses user creation of an advertisement, and complete creation at that.   The same passage goes on to explain that a seller can redundantly enter such data for each media venue, with control being imposed by the Presentation Rules Database 4650 and the Presentation and Configuration Program 4715 of the Seller Interface, to "conform to the controlling format and style for each targeted media venue or outlet presentation." [A123(53:28-56)]   Thus, the Seller or Third Party Professional enters different information for each venue, and that information creates the advertisement for the venue.   This is, at bottom, user creation of advertisements, and not computer controller creation of the advertisements.   It is precisely the invention that Function Media says is excluded from the claims.

Function Media does not seriously dispute that this preferred embodiment discloses user-creation of advertisements.   Rather, it provides page-after-page of hand-waving about other passages in the patent that might refer to automatic advertisement creation [Blue Br. at 35-37], all having no detail of how this would somehow be performed, and then it quickly exits by calling the point a "non-issue" since (in Function Media's view) the claim language is to the contrary.   This is misdirection followed by admission—Function Media has no argument that the specification supports **only** a claim construction of computer controller creation of

advertisements, and its reference back to the claims is hollow because its claimed-based arguments depend on the specification. Function Media runs the reader in circles, but its arguments ultimately lead nowhere.

And again, Function Media ignores its burden here. First, claim constructions that exclude a preferred embodiment are disfavored, and thus require a clear disclaimer—something that even Function Media has not claimed to be present in the '059 patent. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996) (an interpretation excluding a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support."); *Bowers v. Baystate Technologies, Inc.*, 302 F.3d 1334, 1345 (Fed. Cir. 2002) (same, quoting *Vitronics*). Just as important, Function Media's sole reason for asserting that this embodiment is excluded by the claims is that "the express language of the claim excludes any embodiment to the contrary" [Blue Br. at 42] But as noted above, when faced with the actual claim language, Function Media relies on the specification to narrow the language. On this circular argument, Function Media loses.

## C.    The Board's Invalidity Findings Are Supported by Substantial Evidence

Function Media does not seriously dispute this point, nor can it. Specifically, the AdForce User Guide shows, such as via the following figure, the components of an advertisement that a seller can enter in order to create an

33

advertisement:



The Seller selects a graphic, and enters a description and hyperlinks to which the advertisement should link (e.g., so that a web user is taken to the seller's home page if the user clicks on the advertisement). Separately, the seller enters text for the separate Alt Text advertisement that does not display with the main image-based advertisement, but does show up as a text-based advertisement when the user "mouses over" the advertisement area. [A1186-89] Thus, an advertisement is created with the AdForce Seller Interface, both in the combination of the components just discussed, and the provision of text to the Alt Text box.

Function Media argues briefly that AdForce receives only pre-created advertisements, but in doing so, it applies an unduly narrow interpretation of what

it means to create an advertisement.[9]  For example, the Alt Text is advertising text that is displayed to a web user—*i.e.*, an advertisement, or at least part of an advertisement.  Because that text is typed into the box and does not exist in advance, no advertisement exists until that text is provided by the seller.  The same is true of joining the other advertisement components together.  In sum, the AdForce system certain does take an active role in creating advertisements— contrary to Function Media's overly narrow reading of the claims.

Finally, AdForce suggests that the case should be reversed.  [Blue Br. at 55]  But the most the Court can do is reach the issues the Board reached, and leave further consideration of the AdForce reference and the other references under whatever broadest reasonable construction the Court adopts.  *In re Applied Materials, Inc.*, -- F.3d --, 2012 WL 3711586, at *3 (Fed. Cir. Aug. 29, 2012).

## CONCLUSION

Defendants request affirmance of the rejections of the '059 patent.

---

[9] It also ignores that the AdForce manual itself explicitly notes that "AdForce[TM] is a full-service advertising solution ***designed to create, manage, target, and report advertising*** on the World Wide Web.  Centralized outsourced ad serving eliminates the need to purchase and manage hardware and software."  [A1088 (emphasis added)]

Respectfully submitted,

September 24, 2012                    /s/ John. A. Dragseth_____

John A. Dragseth
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Phone: 612-337-5070

Counsel for Google Inc.

## CERTIFICATE OF FILING AND SERVICE

I certify that the Brief of Appellee was electronically filed with the Clerk of

the Court using the CM/ECF System, which will send notification of such filing to

the following counsel of record.

Michael F. Heim
Heim, Payne & Chorush, L.L.P.
JP Morgan Chase Tower
600 Travis, Suite 6710
Houston, TX 77002

Max L. Tribble
Joseph S. Grinstein
Susman Godfrey, L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002

Justin A. Nelson
Susman Godfrey, L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
*Attorneys for Function Media*

Raymond T. Chen
United States Patent and Trademark Office
Office of the Solicitor
MDW8A15
P.O. Box 1450
Mail Stop 8
Alexandria, VA 22213-1450
*Atttorney for Appellee David J.*
*Kappos and U.S. Patent and*
*Trademark Office*

Date: September 24, 2012                   _/s/ Angela Chianelli_____
                                           Angela Chianelli
                                           Litigation Paralegal
                                           Fish & Richardson P.C.

## <u>CERTIFICATE OF COMPLIANCE</u>

The Brief for Appellees complies with the type-volume limitation set forth in FRAP 32(a)(7)(B).  The relevant portions of the Brief, including all footnotes, contain 7,742 words, as determined by Microsoft Word® 2010.

September 24, 2012

   /s/ John A. Dragseth
John Dragseth
FISH & RICHARDSON P.C.
60 South Sixth Street
Suite 3200
Minneapolis, MN  55402
Telephone: (612)  335-5070
Facsimile:  (612) 288-9696

60796555.doc